11 BYRNES, C.J.,
dissents with reasons.
When Dr. Ott sent his check dated April 27, 1995 as a payment on the account, as a matter of law he ratified and acknowledged his indebtedness. Dr. Ott also ratified and acknowledged his obligation on the line of credit in December of 1994 when he executed original loan documents when requested to do so, long after he knew of unauthorized transactions on the line of credit. Dr. Ott admitted that he intended to make good on the loan and that it was his intention from the beginning to be bound for the indebtedness:
Q. Do you recall anyone presenting to you for your signature any documents related to this Paris National Bank loan in December of 1994?
A. I think Beverly brought one that said that the — parish national had failed to get a signature, an original signature on the loan application. From the inception, as a matter of course, I, of course, made that right, since it was my original intention to contract for the loan.
These positive actions proving ratification and acknowledgement are reinforced by Dr. Ott’s failure for many months to repudiate or even question the transactions he now says were unauthorized.
Moreover, even if Dr. Ott cannot be held for the full balance due on the line of credit under theories of ratification and acknowledgement, he should be held liable, at the very least, for the draws totaling $58,000.00 made in January of 1995 | ^because of his breach of his duty to notify the bank of known unauthorized with *301 drawals on his account. The trial court’s finding of “Dr. Ott’s actions under the circumstances to be reasonable,” is so contradicted by Dr. Ott’s own testimony as to be manifestly erroneous. ■
Dr. Ott’s consistently admits that he knew of the unauthorized draw requests as early August of 1994 and no later than October of 1994; and if in October, the strong implication is that it would have been in early October:
Q. When was the first time you learned of the fact that Beverly Ott accessed that line of credit in addition to the . original one thousand dollar draw that you made individually? ■
A. I can’t pin it down to an exact date, but it had to be sometime in late August or September, I think, of '94. Could have some leeway, but, that seems to be about right.
[[Image here]]
Q. How did you come to find out that she had accessed the line of credit?
A. Well, I was in the office and there was some sort of interest sheet or something — or something of that nature from Parish national Bank there, and I saw that and it struck me that I — that I hadn’t— that I — that I hadn’t signed any draws and I don’t know the time span in which I talked to her about it, but I asked her about it and [s]he told me that she had signed my name on that line of credit.
Q. And what time frame are we speaking of? When approximately did that happen?
A. August, September, October, '94. [Emphasis added.]
Dr. Ott went on to testify that at some uncertain time thereafter he called the bank and “asked that all the draw requests be forwarded to me at that time,” but he did not recall telling the bank of any unauthorized activity. He does not contend on this appeal that he told the bank of any unauthorized activity at that time. The trial court did not find that he informed the bank of any unauthorized activity at that time. He also said that he instructed his wife not to sign his name again.
LHe then testified that in October a bank employee, Mr. Seals, informed him that the balance on the line of credit “may bé a hundred thousand dollars.” Dr. Ott testified that when he finally received copies of the draw requests in December of 1994 or January of 1995, he instructed Mr. Seal not to authorize any more draws from that account without his verbal authorization. However, he did not notify the bank that there had been any unauthorized transactions on the account. Dr. Ott could not recall when he finally got around to notifying the bank.
He knew that his wife was purchasing and renovating property, some of which he had a personal interest in and others in the name of Contracting Resources, Inc., of which he was a 30% shareholder, but he had a monumental ignorance of the financing:
Actually, I don’t know what monies went into the account. I really don’t know what account she was using. I knew that properties were being purchased and renovated.
Later his testimony shows that he was concerned enough about what was going on with the line of credit that he tried to take precautions in his real estate dealings:
Q. The money that came from Parish National Bank, are you aware *302 that it was deposited into a Hibernia account?
A. I really don’t know where it was deposited.
Q. You don’t know where it went? Did you know that Beverly had drawn the money on the parish National Bank loan?
A. Well, not ’til I had found the interest payments, sometime [in] September or October, in '94. [Emphasis added.]
Q. Okay. Now, you were aware that she was purchasing properties in the name of Contracting Resources, Inc.?
A. That she was purchasing properties? Yes.
Q. You didn’t know whose name the properties were going in?
A. I know there were some in her name and my name, individually. Through the whole time span, some were in Contracting Resources solely, and two properties, Contracting Resources and Terrence | /Tyler, and then I think the last two were Contracting Resources and Norman Ott.
Q. Was there any reason why you acquired an interest in the last two, in joint ownership with Contracting Resources, Inc.?
A. Yes.
Q. And what would that be.?
A. Well, by this time I knew that the loan was not as it should have been, the draws, and I felt that I could do — that I could control the funds and protect myself, but Mr. Motter was at the closing of these two things and failed to put the funds into escrow, so those fund[s] were lost.
Dr. Ott then acknowledged taping a conversation with his wife on November 29, 1994:
[W]hen we entered the discussion around November — end of November, after I found that interest statement, she told me that she had made the draw and at that time, I told her, “Don’t sign my name to anything.” She told me it was totally paid off, and that was the end of that.
Thus, by his own testimony Dr. Ott admitted that while he became aware of the problem on the line of credit account when he came across the interest statement in September or October (perhaps even in late August), he waited until November 29, 1994 to bring the matter up with his wife and made no mention of it to the bank. I can only assume that Dr. Ott was either in an intentional state of denial, did not want to rock the boat with his wife, or was recklessly indifferent to his financial affairs, or a combination of the above.
The unreasonable lethargy with which Dr. Ott responded to the knowledge of the unauthorized draws comes out over and over again in his testimony:
Q. And despite the fact that as of at least the — early September of 1994, at which time you learned of unauthorized activity on the account, you did nothing to notify parish National Bank that unauthorized activity had occurred, is that correct?
A. I told Kenny in January not to do any more loans.
Q. Do you recall what the balance was on the account at the time you advised Mr. Seal not to make any more draws on the line?
A. As I told you, back in October, I believe I learned it was a hundred thousand dollars.
*303 IsQ. Do you believe it was still commensurate in that amount in January of '95?
A. Well, I think so, yes.
Dr. Ott testified that he and his wife, Beverly, physically separated on January 5, 1995. Dr. Ott thought that one of the properties he purchased jointly with Contracting Resources was acquired subsequent to that date, from which a reasonable fact finder must infer that at least another was acquired prior to that date. What this means is that at the same time that Dr. Ott wants the court to believe that he was reasonable in relying on his wife’s verbal representations that the line of credit balance was paid off as of November 29, 1994, and that she would make no further unauthorized advances, he trusted her so little that he was recording their conversation and was trying to structure the manner in which title was taken to properties in a way that would afford him some extra protection. Dr. Ott’s testimony is either so internally inconsistent as to be unworthy of belief, therefore making it manifest error for the trial court to credit his testimony, or his actions must be characterized as a reckless disregard of reasonable standards of financial practice, even for an uneducated layman. Even an uneducated layman knows or should know that if there is unauthorized activity on his account that he should report it immediately. Either Dr. Ott’s actions constitute a reckless failure to respond in a reasonable manner to knowledge of irregularities on his account, or, more likely, he tacitly acquiesced in and ratified the transactions, and it was only after the marriage and business arrangements with his wife, Beverly, fell apart that he changed his mind and decided to attempt to repudiate the transactions. That he initially intended to tacitly approve and ratify his wife’s actions is demonstrated by his admission he had not repudiated checks signed by his wife in the past without his authorization:
February of '94, she had signed my name on to rather significant checks, and they came back and I saw them Rand at that time, I told her she was never to sign my name again on anything.
Dr. Ott could offer no legally reasonable explanation for not notifying the bank when questioned by his own attorney:
Q. Dr. Ott, you testified that you knew certainly by the fall — sometime in the fall of 1994 that there had been a draw request made?
A. Yes.
Q. Is there any reason why at that point you didn’t call Parish National Bank and tell them about the unauthorized signature?
A. Well, she told me that it had been paid back — and this is my wife. You’ve got marital troubles. I’m trying to work through that, and I just at that time didn’t do it.
The only reasonable conclusion to draw from this testimony is that Dr. Ott did not intend to repudiate the transactions when he learned about them. It was only after he was unable to work out his marital differences that he decided to take any action.
Dr. Ott reaffirmed this later in his testimony on re-cross when asked why he didn’t report the unauthorized activity to the bank:
Well, like I said, she’s my wife. She told me the loan had been completely paid off. We have got marital problems I’m trying to work on, and she told me it was paid.
Any reasonable fact finder would have to conclude that Dr. Ott knew for months about the unauthorized activity on the account but didn’t want to rock the already *304 sinking marital boat by bringing it to the bank’s attention. What may have suited his personal convenience at the time in no way excuses his flagrant disregard of any reasonable standard of financial practice.
Dr. Ott testified that he first requested the bank to require his verbal authorization to any draws sometime between January 15 and January 20. The record does not support the conclusion that either of the two draws made by the bank in January were made after he had given these instructions to the bank.
|7He could even be said to have lulled the Bank into a false sense of security when he furnished signed loan documents to the Bank in December, long after he knew there had been unauthorized draws on the account.
The trial court’s reasons for judgment state that it was reasonable for Dr. Ott to wait until November 29, 1994, to ask his wife about the unauthorized draws, a period of no less than a month and perhaps more than two months after his discovery of the problem. The trial court’s reasons for judgement further indicate that it was reasonable for Dr. Ott to wait until sometime in January, at least two weeks after he received copies of the draw requests, before instructing the bank not to make any more advances without his authorization, but still not alerting the bank to any problems on the account. The trial court’s reasons fail to take into account the fact that Dr. Ott did not need copies of the draw requests in order to know that there were unauthorized draws on the line of credit. Already quoted above is Dr. Ott’s testimony acknowledging that when he came upon the Parish Bank interest notice sometime in August, September or October, that, “it struck me that I — that I hadn’t that I — that I hadn’t signed any draws ...” He knew that any draws were unauthorized because he knew he didn’t co-sign them. He didn’t need two weeks to study the copies of the draws before his half-hearted attempt to stop the activity on the account in January after the horse was out of the barn. This was not an active business checking account with numerous banks statements and hundreds of checks to review. There were only a handful of draws and he knew without looking that they were all unauthorized. His wife had already admitted to that in November. But even if she had denied it, he still knew that the activity was unauthorized because he didn’t co-sign the draw requests, and he knew that from sometime in August, September or October according to his own testimony. Thus, this is not a case of how long is a reasonable delay for a bank customer to get around to examining his bank statement or cancelled checks in order to | sdiscover any irregularities. This is a matter of how long is it reasonable for a customer to delay in notifying a bank of known irregularities!! The only reasonable answer to that has got to be: “As soon as is practicable.” No reasonable fact finder could find that, “As soon as is practicable” could be as long as weeks or months. In other words, no reasonable fact finder could find that Dr. Ott’s conduct was reasonable. In fact, it can only be characterized as reckless, gross negligence, egregious and outrageous — so much so that the only logical conclusion is that, at the time, he did not intend to repudiate the transactions.
Dr. Ott admits that it was not until March or April at the earliest that he finally notified his accountant that his signature on the draws were forged. He asked his accountant to contact the bank.
On that portion of the tape that the court allowed into evidence there is conversation between Dr. Ott and his wife showing his intent to ratify her actions, at least to some extent:
*305 Mrs. Ott: I m sure I have always told you that I owed almost a hundred thousand dollars.
Dr. Ott: Right, but I thought there was one draw, one time, to that first piece [of property] and that was it, and I never told you to sign my name. In fact, I didn’t even release its because—
Here Dr. Ott indicates that he-knew for some time that his wife had drawn down perhaps one hundred thousand dollars without his authorization but that he did not intend to repudiate the transaction at that time.
Dr. Ott also testified that he was not at home during the day and that whoever was home, including his wife would receive the mail. However, even after he learned of the unauthorized draws on the line of credit in August or September he never asked his wife whether any correspondence or notices had been received from the bank. He explained this by saying, “I had no reason to.”
[flThe behavior of Dr. Ott in this matter was so egregious and unreasonable as to overshadow any minor shortcomings attributable to the bank. The problem here was not how long it took Dr. Ott to obtain and examine copies of account records when he admits that he knew for certain in September or August of 1994 (or at the latest, October) that unauthorized transactions had been made on his account, but it was not until months later that he took even minimal action, and it was not for several months after that that he finally told the bank that his signature had been forged on the draw requests. The finding of the trial court that the actions of Dr. Ott were reasonable under the circumstances is so clearly contradicted by Dr. Ott’s own testimony, even after viewing the evidence in the light most favorable to Dr. Ott and the findings of the trial court, that a finding by this court of manifest error is inescapable.
For the foregoing reasons, I would reverse the judgment of the trial court and render judgment in favor of the Bank for the full amount of its claim. In the alternative, I would award the Bank at least $58,000, the amount of the draws made in January, after Dr. Ott had notice that unauthorized draws had been made on his account.